1

2  I HEREBY CERTIFY THAT THIS DOCUMENT WAS SERVED BY
   FIRST CLASS MAIL POSTAGE PREPAID, TO ~~ALL COUNSEL~~ Petitioner

3  ~~(OR PARTIES)~~ AT THEIR RESPECTIVE MOST RECENT ADDRESS OF
   RECORD IN THIS ACTION ON THIS DATE.

   DATED:_____8.29.12_____

4

5  DEPUTY CLERK



6

7

8

9

10              **UNITED STATES DISTRICT COURT**

11              **CENTRAL DISTRICT OF CALIFORNIA**

12

    RODNEY BARNES,              ) Case No. CV 12-2076-JPR
13                              )
                   Petitioner,  )
14                              ) MEMORANDUM OPINION AND ORDER
             vs.                ) DENYING PETITION AND DISMISSING
15                              ) ACTION WITH PREJUDICE
    TERRI GONZALES, Warden,     )
16                              )
                   Respondent.  )
17                              )

18

19                       **PROCEEDINGS**

20      On March 12, 2012, Petitioner filed a Petition for Writ of

21  Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C.

    § 2254, raising four claims for relief.  On May 14, 2012,
22
    Respondent filed an Answer with an attached memorandum.
23
    Petitioner did not file a reply.  The parties consented to the
24
    jurisdiction of the undersigned U.S. Magistrate Judge pursuant to
25
    28 U.S.C. § 636(c).  For the reasons discussed below, the Court
26
    denies the Petition and dismisses this action with prejudice.
27
                         **BACKGROUND**
28

                              1

1  burglary, in violation of California Penal Code section 459, and
2  forgery, in violation of section 476.   (Lodgment 12, 1 Clerk's
3  Tr. at 43-44.)   The trial court sentenced Petitioner to four
4  years in prison.   (Id. at 152-57.)

5      Petitioner appealed, raising claims corresponding to claims
6  one through three and subclaim (A) of claim four in the Petition.
7  (Lodgment 1.)   On May 19, 2011, the court of appeal affirmed his
8  convictions and sentence.   (Lodgment 4.)   Petitioner then filed a
9  Petition for Review in the state supreme court, which that court
10 summarily denied on August 31, 2011.   (Lodgments 5, 6.)

11     While his direct appeal was pending in the court of appeal,
12 Petitioner filed a habeas petition in the same court, raising
13 subclaim (B) of claim four.   (Lodgment 7.)   On May 19, 2011, the
14 court of appeal denied the petition in a reasoned decision.
15 (Lodgment 8.)   Petitioner raised the same claim in a habeas
16 petition in the state supreme court, which summarily denied it on
17 August 31, 2011.   (Lodgments 9, 10.)

18                       **PETITIONER'S CLAIMS**

19     I.   The trial court violated due process and Petitioner's
20 constitutional right to confront witnesses by admitting into
21 evidence a purportedly fake invoice given by defense counsel to
22 the prosecutor before trial.   (Pet. at 5.)

23     II.   The trial court violated due process by denying
24 Petitioner's motion to reopen the proceedings at the end of trial
25 to allow him to testify.   (Id.)

26     III. The prosecutor committed misconduct by commenting in
27 closing argument on Petitioner's failure to testify, in violation
28 of Griffin v. California, 380 U.S. 609, 85 S. Ct. 1229, 14 L. Ed.

                                   2

1  2d 106 (1965).  (Pet. at 5-6.)

2       IV.  Trial counsel was constitutionally ineffective for

3  failing to (A) object to the alleged Griffin error or (B)

4  authenticate the fake invoice given to her by Petitioner, which

5  was subsequently admitted at trial to inculpate him.  (Id. at 6.)

6                        **SUMMARY OF THE EVIDENCE**

7       The factual summary set forth in a state appellate court

8  opinion is entitled to a presumption of correctness pursuant to

9  28 U.S.C. § 2254(e)(1).  See Vasquez v. Kirkland, 572 F.3d 1029,

10 1031 n.1 (9th Cir. 2009).  Because Petitioner does not challenge

11 the sufficiency of the evidence, the Court adopts the following

12 statement of facts from the California Court of Appeal opinion on

13 direct appeal as a fair and accurate summary of the evidence

14 presented at trial.[1]

15           On July 23, 2008, [Petitioner] entered a bank in

16      Lancaster, handed the teller a check, and asked to have

17      it cashed.  The check proffered by [Petitioner] is drawn

18      on the account of a concrete manufacturer called

19      Robertson's.  The check is not genuine: it lacks security

20      features, such as a border, colored background, invisible

21      fibers, and a special type font.  Robertson's never

22      issued checks that look like the one that [Petitioner]

23      sought to negotiate, and [Petitioner]'s check bore a

24      serial number that was not used by Robertson's.

25           When [Petitioner] handed over the check, the bank

26

27  _____

28      [1]  The Court has nonetheless independently reviewed the
    state-court record.

                                3

teller became suspicious because the texture of the paper and the ink looked like something printed on a home computer. (The teller received training from the bank to help him identify fraudulent checks.) [Petitioner] did not have an account at the bank, so the teller asked for identification and placed imprints of [Petitioner]'s finger on the check. When the check was run through a computerized processing system, it generated an alert. The teller directed [Petitioner] to wait in the lobby while he verified the transaction with a supervisor.

While [Petitioner] waited, a bank manager investigated the veracity of [Petitioner]'s check. He located photocopies of Robertson's genuine checks, and saw that the characteristics of those checks are entirely different from the one presented by [Petitioner]. He telephoned Robertson's to confirm that the check was fraudulent, then contacted the bank's corporate security department and the sheriff's department. He noticed that [Petitioner] was fidgety and looked around nervously. After a while, [Petitioner] departed the bank without a word, leaving behind his identification and the check.

Two hours later, [Petitioner] reappeared at the bank, approached the teller window, and asked for the return of the check and his identification. The bank manager — who by then knew that the check was fraudulent — tried to stall [Petitioner] until the sheriff's department arrived, and asked [Petitioner] why he had the check. [Petitioner], who still seemed nervous, described

4

it as a payroll check and said that he had to leave for an appointment. When the manager refused to return the identification or the check, [Petitioner] turned around and left. [Petitioner] did not seem surprised or shocked that the bank refused to cash the check.

After [Petitioner] departed (for the second time), a customer turned in a wallet that was left on the counter at the bank. The wallet contained an ATM card bearing [Petitioner]'s name, and a business card from the California Department of Corrections. [Petitioner] did not return to the bank to claim his wallet, his identification, or the check. The person listed on the CDC card was [Petitioner]'s parole officer.

The deputy sheriff assigned to the case has special training to detect check fraud. He testified that it is relatively simple to produce the kind of check that [Petitioner] attempted to negotiate. The check stock and check-writing software can be purchased at a business supply store or online. The deputy confirmed with Robertson's that the check tendered by [Petitioner] is fraudulent. Based on the deputy's experience, he believes that the check was produced on a home computer, although the identity of its creator is unknown.

The parties stipulated that [Petitioner] sent a letter to the court, and it was read to the jury. It states, "My family is really suffering due to a bad check that was issued to me for my labor, and I had no idea it was bad. I actually furnished the bank with my

1     California identification card, three fingerprints, and

2     waited for over a half an hour. So that, in itself,

3     should prove I had no knowledge whatsoever whether the

4     check was genuine or not."

5 (Lodgment 4 at 2-3 (footnote omitted).)

6                 **STANDARD OF REVIEW**

7     Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism

8 and Effective Death Penalty Act of 1996 ("AEDPA"):

9     An application for a writ of habeas corpus on behalf of

10     a person in custody pursuant to the judgment of a State

11     court shall not be granted with respect to any claim that

12     was adjudicated on the merits in State court proceedings

13     unless the adjudication of the claim — (1) resulted in a

14     decision that was contrary to, or involved an

15     unreasonable application of, clearly established Federal

16     law, as determined by the Supreme Court of the United

17     States; or (2) resulted in a decision that was based on

18     an unreasonable determination of the facts in light of

19     the evidence presented in the State court proceeding.

20     Under AEDPA, the "clearly established Federal law" that

21 controls federal habeas review of state-court decisions consists

22 of holdings of Supreme Court cases "as of the time of the

23 relevant state-court decision." Williams v. Taylor, 529 U.S.

24 362, 412, 120 S. Ct. 1495, 1523, 146 L. Ed. 2d 389 (2000).

25     Although a particular state-court decision may be both

26 "contrary to" and "an unreasonable application of" controlling

27 Supreme Court law, the two phrases have distinct meanings. Id.

28 at 391, 413. A state-court decision is "contrary to" clearly

1  established federal law if it either applies a rule that

2  contradicts governing Supreme Court law or reaches a result that

3  differs from the result the Supreme Court reached on "materially

4  indistinguishable" facts.  <u>Early v. Packer</u>, 537 U.S. 3, 8, 123 S.

5  Ct. 362, 365, 154 L. Ed. 2d 263 (2002).  A state court need not

6  cite or even be aware of the controlling Supreme Court cases, "so

7  long as neither the reasoning nor the result of the state-court

8  decision contradicts them."  <u>Id.</u>

9       State-court decisions that are not "contrary to" Supreme

10  Court law may be set aside on federal habeas review only "if they

11  are not merely erroneous, but 'an <u>unreasonable</u> application' of

12  clearly established federal law, or based on 'an <u>unreasonable</u>

13  determination of the facts' (emphasis added)."  <u>Id.</u> at 11.  A

14  state-court decision that correctly identifies the governing

15  legal rule may be rejected if it unreasonably applies the rule to

16  the facts of a particular case.  <u>Williams</u>, 529 U.S. at 406-08.

17  To obtain federal habeas relief for such an "unreasonable

18  application," however, a petitioner must show that the state

19  court's application of Supreme Court law is "objectively

20  unreasonable."  <u>Id.</u> at 409-10.  In other words, habeas relief is

21  warranted only if the state court's ruling is "so lacking in

22  justification that there was an error well understood and

23  comprehended in existing law beyond any possibility for

24  fairminded disagreement."  <u>Harrington v. Richter</u>, 562 U.S. ___,

25  131 S. Ct. 770, 786-87, 178 L. Ed. 2d 624 (2011).

26       Here, Petitioner raised claims one through three and

27  subclaim (A) of claim four on direct appeal, and he raised

28  subclaim (B) of claim four on habeas review (Lodgments 1, 7); the

7